IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


Edward "Eddie" Acevedo, et al.,    )
                                   )
            Plaintiffs,            )
                                   )
                                   )
                                   )
                                   )
    v.                             )    No. 18 C 293
                                   )
The Cook County Officers           )
Electoral Board et al.,            )
                                   )
            Defendants.            )
                                   )


Memorandum Opinion and Order

Plaintiffs are candidates for public office in Cook County who seek to have their names included on the ballot in the Democratic Party primary election to be held on March 20, 2018. The Illinois Election Code provides that candidates for the offices plaintiffs seek must submit a petition for nomination containing "at least the number of signatures equal to 0.5% of the qualified electors of [their] party who cast votes at the last preceding general election in Cook County." This requirement means, for the 2018 election cycle, that plaintiffs Acevedo and Raila (candidates for Cook County Sheriff and Cook County Assessor, respectively) had to obtain 8,236 qualified signatures, while plaintiffs Shaw, Stroger, Joyce, Williams, and

Avila (candidates for Commissioner of the Metropolitan Water Reclamation District of Greater Chicago) had to obtain 8,075 qualified signatures to be included on the Democratic primary ballot. *See* 10 ILCS 5/7-10(d)(1), 5/7-10(g). A separate provision of the Illinois Election Code establishes that candidates for statewide office are required to submit petitions containing a minimum of 5,000 qualified signatures. 10 ILCS 5/7-10(a).

The complaint alleges that each plaintiff submitted a petition with signatures facially in excess of the relevant minimum requirement. But signature records examinations by the Cook County Clerk and the Chicago Board of Election Commissioner determined that each petition but Raila's (which evidently is still under challenge) fell short of the required number of valid signatures. All plaintiffs, however, obtained more than the 5,000 valid signatures that would have qualified them for inclusion on the Democratic primary election had they been running for statewide office.

Plaintiffs claim that their exclusion from the Democratic primary ballot pursuant to 10 ILCS 5/7-10 violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment under *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979), *Norman v. Reed*, 502 U.S. 279 (1992), and *Gjersten v. Board of Election Com'rs for City of*

*Chicago*, 791 F.2d 472 (7th Cir. 1986). They seek temporary and permanent injunctive relief in the form of an order enjoining defendants from enforcing any signature requirement greater than 5,000 for the offices they seek and compelling defendants to include their names on the March 20, 2018 Democratic Party Ballot. Before me is plaintiffs' motion for a temporary restraining order and preliminary injunction, which has been briefed and argued at hearings on January 16 and 23, 2018.[1] For the reasons that follow, the motion is denied.

Because plaintiffs' central reliance is on *Socialist Workers Party*, a brief summary of that case is helpful. *Socialist Workers Party* involved a challenge to the Illinois Election Code in the context of a special general election for Mayor of Chicago. At the time, the statute required new political parties and independent candidates for statewide office to obtain 25,000 signatures to appear on the ballot. 440 U.S. at 175. New parties and independent candidates for office in political subdivisions of the state, by contrast, required signatures of at least 5% of the number of voters who voted in

---

[1] Although plaintiffs' motion is styled, "Emergency Motion for Ex Parte Temporary Restraining Order," defendants were present at both of the hearings, and the Illinois State Board of Elections and its individual members filed a written response to the motion. In both the caption and the text of their reply, plaintiffs restyle the motion as one for both a temporary restraining order and a preliminary injunction. Accordingly, I construe their motion as seeking both forms of relief.

the previous election for offices within that political subdivision. *Id*. at 175-76. This scheme produced the "incongruous result" that to gain access to the ballot, a new party or independent candidate in the City of Chicago or Cook County needed substantially more signatures—nearly 36,000 for the election at issue in *Socialist Workers Party*—than a similarly situated party or candidate for statewide office. *Id.* at 176-77. The Court acknowledged that states have "a legitimate interest in regulating the number of candidates on the ballot," because the state had advanced "no reason, much less a compelling one" for imposing a higher burden on candidates for Chicago and Cook County offices than it did for candidates to state offices, it held that the discrepancy violated the Equal Protection Clause. *Id*. at 186.

Plaintiffs argue that under *Socialist Workers Party*, any ballot access law whose application in any given election cycle yields, as it has here, a numerically greater signature requirement for candidates seeking county office than for candidates seeking statewide office must be supported by a compelling state interest. Read in isolation, *Socialist Workers Party* arguably supports that proposition. But the Seventh Circuit has declined to read the case so broadly. *See, e.g., Bowe v. Board of Election Com'rs of City of Chicago*, 614 F.2d 1147 (1980); *Gjersten v. Board of Election Com'rs for City of*

4

*Chicago*, 791 F.2d 472 (7th Cir. 1986); and *Stone v. Board of Election Com'rs for City of Chicago*, 750 F.3d 678 (2014). Moreover, the Supreme Court's subsequent decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), have clarified and refined the framework for evaluating challenges to ballot restriction measures. Under the analysis established in those cases, plaintiffs have not shown their entitlement to a temporary restraining order or a preliminary injunction.[2]

In *Bowe*, the Seventh Circuit rejected the argument that *Socialist Workers Party* "stands for the broad proposition that a state may never impose a higher signature requirement for an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision." 614 F.2d at 1151. The *Bowe* plaintiffs sought to enjoin the application of provisions of the Illinois Election Code imposing a 10% minimum signature requirement on candidates for the office of Ward Committeeman in Chicago—which, depending on the ward, meant between 834 and 2,280 signatures—while candidates for State Central Committeeman required a fixed minimum of only 100 signatures to qualify for the ballot. *Id*. at 1150. The court noted that "the state's

---

[2]To establish their entitlement to preliminary relief, plaintiffs must show, among other things, that they are likely to succeed on the merits of their claim. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016).

interests in preserving the integrity of its electoral process and regulating the number of candidates on the ballot are compelling," then went on to observe that the Supreme Court "has consistently taken an intensely practical and fact-oriented approach to deciding these election cases." *Id*. at 1151-52. For these reasons, it rejected the plaintiffs' request for injunctive relief in the absence of a fully developed factual record "as to the circumstances, background and operation of the statute in question." *Id*. at 1152.

*Bowe*'s essential teaching is that courts must examine the facts of each case, including "the actual historical impact of the statute." *Id*. (citing *Jenness v. Fortson*, 403 U.S. 431 (1971)). In ballot access cases such as this, courts must look at "the actual impact of the signature requirement" in the context of the state's election scheme as a whole. *Id*. "The ultimate question," the court explained, is whether "a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Id*. (citing *Storer v. Brown*, 415 U.S. 724, 742 (1974)). Yet, plaintiffs have offered none of the facts that would be necessary to undertake that analysis and to conclude that the Illinois Election Code unfairly burdens their interest in access to the ballot. Instead, they argue that the numbers themselves— that is, the comparison between the signature requirements that

apply to them and the signature requirement that applies to statewide candidates—establishes a prima facie constitutional violation. But *Bowe* rejects precisely that argument.

Nevertheless, plaintiffs insist that *Bowe* supports their claim, seizing on the passage in which the court characterized *Socialist Workers Party* as "an exception to the more common fact-oriented approach in this area, an exception warranted by the extreme and incongruous operation of the statute in question." *Id*. Plaintiffs argue that the Illinois Election Code produces an even more "extreme and incongruous" result in this case, since their signature requirements are more than 60% higher than statewide candidates' signature requirements, whereas *Socialist Workers Party* struck down a requirement that was only 44% higher than the one that applied to statewide candidates. This argument is not well-taken, however, because it obscures the crucial fact that the signature minimums the plaintiffs challenge in this case are several orders of magnitude smaller, in absolute values, than the ones at issue in *Socialist Workers Party*. The distinction is critical.

I am mindful that plaintiffs are not challenging the 0.5% signature requirement, or even the absolute number that percentage yields, as overly burdensome on its face, and that their challenge is instead to the disparity between their requirement and the one that applies to candidates for statewide

7

office.[3] But as *Anderson* and its progeny confirm, the first step of the inquiry is to ask: to what extent are fundamental individual rights burdened by the state's election scheme? *Anderson*, 460 U.S. at 789 (courts "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" before weighing these against the state's asserted countervailing interests).

Indeed, as the Seventh Circuit recently observed, "[p]ractically speaking, much of the action takes place at the first stage of *Anderson*'s balancing inquiry." *Stone v. Board of Election Com'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014). *Stone* concerned a challenge to the Illinois Election Code's provisions establishing a 12,500 signature minimum for

---

[3] At oral argument, plaintiffs' counsel emphasized that nearly all of the candidates who have been challenged in the upcoming election are women or minorities. *See*, e.g., Tr. of 01/16/2018 Hr'g. at 9:22-24 ("every single candidate that has been challenged besides one is a woman or a minority"); 13:12-13 ("all the people challenged besides one are women and minorities"); Tr. of 1/23/2018 Hr'g. at 17:2-4 ("everybody challenged countywide at large, besides one person, was a minority and a woman. All the remaining challenges are minorities or women."). To be clear, however, their complaint does not claim that the challenged provisions of the Illinois Election Code create suspect race- or gender-based classes, or that the statute discriminates against them based on their race and/or gender. Indeed, none of the cases plaintiffs cite concerns allegedly race- or gender-discriminatory election laws. Their theory, rooted exclusively in *Socialist Workers Party* and its progeny, is that the statute creates geographic classifications that have no rational relation to any legitimate state interest.

Chicago's mayoral candidates. Citing *Bowe*, the court held that "[w]hat is ultimately important is not the absolute or relative number of signatures required but whether a reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Id.* at 682 (internal quotation marks and citation omitted). The court then considered the fact that nine mayoral candidates had achieved the required minimum to be "powerful evidence that the burden of gathering 12,500 signatures in ninety days is not severe." *Id.* at 683. In this case, plaintiffs have offered no evidence to suggest that the burden on them is severe, or even substantial. In fact, their counsel represented that although plaintiff Raila's ballot eligibility is still undergoing a challenge, she is, after signature record examination, "5,902 signatures beyond the required minimum." Tr. of 01/23/2018 Hr'g. at 17:5-8. If that is accurate, it cuts against the inference *Stone* requires.

Like *Bowe*, *Stone* confirms that *Socialist Workers Party* cannot be read to obviate plaintiffs' burden of establishing, through prima facie evidence, a constitutionally significant restriction on their fundamental rights. *Gjersten*, cited by plaintiffs, is not to the contrary. *Gjersten* concerned a challenge to a provision of the Illinois Election Code requiring candidates for the office of ward committeeman in the City of Chicago to submit nominating petitions with the signatures of

10% of the electors in their wards, while candidates for the suburban office of township committeeman—substantively the same office—needed the signatures of only 5% of the electors of their townships. 791 F.2d at 473, 476. The Seventh Circuit again stated its view that *Socialist Workers Party* does not stand for the "broad position that a state may never impose a higher signature requirement for an office of a smaller subdivision than the requirement imposed for any office of a larger subdivision." *Id.* at 477 (quoting *Bowe* 614 F.2d at 1151). But based on "the affidavits, the evidence of the statute's effect in past elections and the evidence presented during a two-hour hearing on the motion for a preliminary injunction," the court concluded that the discrepancy in signature requirements did not pass constitutional muster. Plaintiffs have not sought to present the kind of evidence on which the *Gjersten* court relied. In fact, asked at oral argument whether the candidate field for the offices plaintiffs seek had been larger in past election cycles, when the signature requirement was less than 5,000 (which, if so, might suggest that the higher minimums in the 2018 election cycle had a material negative effect on candidates' ability to obtain the necessary signatures), plaintiffs had no clear answer. In the present posture of this case, *Gjersten* supports defendants.

Further, as defendants point out, numerous cases have upheld minimum signature requirements substantially more burdensome than the 0.5% requirement that applies to plaintiffs. *See, e.g.*, *Burdick*, 504 U.S. at 435 and n. 4 (upholding Hawaii's "one percent of the State's registered voters" requirement and noting its approval of equally or more burdensome requirements) (citing *Norman v. Reed*, 502 U.S. 279, 295 (1992); *American Party of Texas v. White*, 415 U.S. 767 (1974); and *Jenness v. Fortson*, 403 U.S. 431 (1971)). *See also Stone*, 750 F.3d at 683 (observing that percentages ranging from 1% to as high as 5% of the eligible voting base have been considered reasonable). Although these cases indeed do not establish a bright-line rule or "litmus test" for constitutionality, they do reflect the range of restrictions courts have considered to be reasonable. In the face of these decisions, plaintiffs must come forward with something more than dogged reliance on an expansive reading of *Socialist Workers Party* to show that the signature requirement the Illinois Election Code imposes on them amounts to an unreasonable burden on their fundamental rights. Because they have not, and because *Socialist Workers Party* does not, without more, transform a facially reasonable ballot restriction into an Equal Protection violation each time one class of candidates in a smaller political subdivision is subject to a more onerous

11

signature requirement than another class of candidates in a larger one, plaintiffs' motion is denied.

**ENTER ORDER:**

_Elaine E. Bucklo_

**Elaine E. Bucklo**
United States District Judge

Dated: January 24, 2018